(February 8, 1916.)

HAROLD RILEY et al., Appellants, v. CALLAHAN MIN-ING COMPANY, a Corporation, et al., Respondents.

[155 Pac. 665.]

MINING CORPORATIONS—DISCONTINUANCE OF BUSINESS—DEGREE OF GOOD
    FAITH REQUIRED FROM DIRECTORS AND OFFICERS—TRUST RELATION
    TO STOCKHOLDERS—ULTRA VIRES ACTS—STATUTORY CONSTRUCTION—
    ARTICLES OF INCORPORATION—RIGHTS OF MINORITY STOCKHOLDERS—
    MEASURE OF RELIEF GRANTED TO—EQUITABLE POWERS OF COURT.

    1.  A combination of the holders of the majority of the stock of a corporation to elect directors and officers and to control the acts of the corporation in order to carry out some particular purpose or policy, imposes upon such directors and officers a high degree of good faith and diligence in protecting the interests of all the stockholders, and constitutes them trustees in effect for such of the stockholders as object to the policy pursued by the majority stockholders.

    2.  The directors and officers of a corporation hold the corporate funds in trust, and any attempt on their part to divert the

use of such funds to their personal profit or interest is a violation of the trust imposed by virtue of the office.

[As to directors of a corporation as trustees for the company, see note in 139 Am. St. 602.]

3. A corporation organized to do a general mining business, not having been granted the power to loan money in its articles of incorporation, cannot loan the corporate funds out at interest on a promissory note, and such act is *ultra vires*.

4. The amendment to sec. 2767, Rev. Codes (Sess. L. 1909, p. 163), by which "every corporation as such" is granted the power "to purchase, own, vote, sell or hypothecate the stock and bonds of other corporations," is not an unqualified grant of power, but must always be construed in the case of any particular corporation with reference to the purposes for which the corporation was organized as expressed in its articles of incorporation.

5. Sec. 2714, Rev. Codes, requires articles of incorporation to state the purpose for which the corporation is formed, not only to inform the sovereign which creates the corporation, but also in order to formulate in a solemn and binding manner the contract of association between the incorporators, and express the actual considerations which induced them to thus associate themselves together.

6. Where a corporation organized to do a general mining business transfers all its property to another mining corporation in exchange for shares of stock in the latter, and exercises its corporate functions in no other way than by holding and voting such stock for a period of nearly three years, such discontinuance of the business for which it was organized will not of itself work a forfeiture of its charter or compel a dissolution, but is a circumstance to be considered by the court in a suit by minority stockholders to compel a distribution of the corporate assets upon this and other grounds.

7. Findings of fact reviewed, and certain findings approved and others disapproved as not being sustained by the evidence.

8. Where a corporation organized to do a general mining business transfers all its property to another mining corporation in exchange for shares of stock in the latter, and wholly discontinues mining operations, and minority stockholders demand a distribution of the stock so held, and it appears that such minority stockholders have no representation on the board of directors or among the officers of the corporation, but that such officers and directors have combined to exclude the minority stockholders from participation in the business of the corporation and have attempted to commit acts which are prejudicial to the interests of all the stockholders

and *ultra vires, held,* that the minority stockholders are entitled to equitable relief compelling such corporation to reduce its capital stock to the extent required to enable it to distribute among such minority stockholders their proportionate share of the corporate assets, in exchange for the surrender and cancellation of their shares of stock.

APPEAL from the District Court of the First Judicial District, for Shoshone County.    Hon. Wm. W. Woods, Judge.

Action by minority stockholders in an Idaho corporation, asking for the appointment of a receiver, the dissolution of the corporation, and a division of the assets of the corporation.    Judgment for defendants.    *Reversed.*

C. W. Beale and John H. Wourms, for Appellants.

The old doctrine that minority stockholders had no relief and the conduct of the affairs of the corporation could only be investigated by the state on relation of the attorney general, if not supplanted, has, to a very great degree, been modified by the modern doctrine of minority rights and existing business necessity. (*Hall v. Nieukirk,* 12 Ida. 33, 118 Am. St. 188, 85 Pac. 485; *Gibbs v. Morgan,* 9 Ida. 100, 72 Pac. 733.)

The officers of a corporation are trustees for the creditors and stockholders.    The officers being in a place of trust, are, of course, obliged to execute their duties with fidelity, not for their own benefit, but for the common benefit of all the stockholders of the corporation.    The directors and trustees of a corporation hold a fiduciary relation to the stockholders. (*Symmes v. Union Trust Co.,* 60 Fed. 830; *Miner v. Belle Isle Ice Co.,* 93 Mich. 97, 53 N. W. 218, 17 L. R. A. 412.)

A breach of duty by a person acting in a fiduciary capacity is "constructive fraud." (*Warren v. Robinson,* 21 Utah, 429, 61 Pac. 28.)

A receiver should have been appointed, stock and cash distributed, and the Callahan company dissolved. (*Gibbs v. Morgan, supra; Hall v. Nieukirk, supra;* Smith on Receiverships, sec. 225; *Miner v. Belle Isle Ice Co., supra;* 4 Thompson on Corp., 2d ed., sec. 4622; *Ponca Mill Co. v. Mikesell,* 55

Neb. 98, 75 N. W. 46; *Treat v. Pennsylvania Mut. Life Ins. Co.*, 203 Pa. 21, 52 Atl. 60; *Jones v. Missouri-Edison Electric Co.*, 144 Fed. 765, 75 C. C. A. 631; *Wheeler v. Abilene Nat. Bank Bldg. Co.*, 159 Fed. 391, 89 C. C. A. 477, 16 L. R. A., N. S., 892, 14 Ann. Cas. 917.)

The expressly granted power to own stock does not give the corporation any more right to own stock outside of the purposes for which the corporation was organized than does the expressly granted power to contract give it the right to make contracts outside of those purposes. (*Salmon River Min. etc. Co. v. Dunn*, 2 Ida. 26, 3 Pac. 911; *State v. Atlantic City & S. R. Co.*, 77 N. J. L. 465, 72 Atl. 111; *Gerhard v. Welsh*, 80 N. J. Eq. 203, 82 Atl. 871; *Williams v. Johnson*, 208 Mass. 544, 95 N. E. 90; *Robinson v. Holbrook*, 148 Fed. 107; *Bowditch v. Jackson Co.*, 76 N. H. 351, Ann. Cas. 1913A, 366, 82 Atl. 1014; *Central R. Co. v. Collins*, 40 Ga. 582; *Stacy v. Glen Ellyn Hotel etc. Co.*, 223 Ill. 546, 79 N. E. 133, 8 L. R. A., N. S., 966.)

"Courts of equity are established for the administration of justice in those peculiar cases where substantial justice cannot be administered under the express rules of law, and to adopt a rigid rule that recognizes no exceptions would be to rob such courts of much of their efficacy and power for administering even handed justice." (*Twin Falls County v. West*, 25 Ida. 271, 277, Ann. Cas. 1916B, 185, 137 Pac. 171; *Sharon v. Tucker*, 144 U. S. 533, 12 Sup. Ct. 720, 36 L. ed. 532; *Toledo etc. R. Co. v. Pennsylvania Co.*, 54 Fed. 746, 19 L. R. A. 395; 1 Story, Equitable Jurisprudence, 13th ed., p. 21; 16 Cyc. 478.) Equity commonly achieves its end by directing the parties over whom it has jurisdiction *in personam* to act in such a way that the desired result is accomplished. (*Hart v. Sansom*, 110 U. S. 151, 3 Sup. Ct. 586, 28 L. ed. 101; *Northern Securities Co. v. United States*, 193 U. S. 197, 24 Sup. Ct. 436, 48 L. ed. 679.)

J. P. Gray and J. E. Gyde, for Respondents.

The mere cessation or suspension or discontinuance by a corporation of corporate business, unless by a resolution of

the stockholders to discontinue business, will not operate as a dissolution of the corporation. (Cook on Corporations, secs. 631, 634, 747; *Law v. Rich,* 47 W. Va. 634, 35 S. E. 858; 5 Thompson on Corporations, 2d ed., sec. 6488.)

The method of dissolution of a corporation is provided by statute. (*Kohl v. Lilienthal,* 81 Cal. 378, 20 Pac. 401, 22 Pac. 689, 6 L. R. A. 520; *O'Dea v. Hollywood Cemetery Assn.,* 154 Cal. 53, 97 Pac. 1; *Tapscott v. Mexican Colorado R. Land Co.,* 153 Cal. 664, 96 Pac. 271; Thompson on Corporations, sec. 6510.) An *ultra vires* act is not ground for dissolution. (*Sternberg v. Wolff,* 56 N. J. Eq. 555, 42 Atl. 1078.)

In the absence of express statutory authority, jurisdiction of courts of equity does not exist over corporate bodies to such an extent as to justify them in dissolving corporations, or of winding up their affairs and sequestrating their property. (*Wallace v. Pierce-Wallace Pub. Co.,* 101 Iowa, 313, 63 Am. St. 389, 70 N. W. 216, 38 L. R. A. 122; *Dudley v. Dakota Hot Springs Co.,* 11 S. D. 559, 79 N. W. 839; *Fischer v. Superior Court,* 110 Cal. 129, 42 Pac. 561; *Havemeyer v. Superior Court,* 84 Cal. 327, 18 Am. St. 192, 24 Pac. 121, 10 L. R. A. 627; *People's Home Sav. Bank v. Superior Court,* 103 Cal. 27, 36 Pac. 1015; note to *Neall v. Hill,* 76 Am. Dec. 508; *French Bank Case,* 53 Cal. 495; *Mason v. Supreme Court,* 77 Md. 483, 39 Am. St. 433, 27 Atl. 171; *Empire Hotel Co. v. Main,* 98 Ga. 176, 25 S. E. 413; *Richardson v. Clinton Wall Trunk Mfg. Co.,* 181 Mass. 580, 64 N. E. 400.)

If there is any necessity for action to protect the funds of the corporation, injunctive relief is proper. (High on Receivers, 4th ed., sec. 288; Clark and Marshall on Corporations, sec. 566.)

There cannot be found a single case where it has been held that a corporation that has sold its property to another corporation engaged in exactly the same business as the selling corporation was engaged in, could not take and hold the stock of the purchasing corporation received as the purchase price of the selling corporation's property, unless there was some statute prohibiting such a holding, or such a holding was in restraint of trade. (*Bigelow v. Calumet & Hecla Min. Co.,*

155 Fed. 869; 4 Thompson on Corporations, 2d ed., secs. 4058–4060; *Dewey v. Toledo, A. A. & N. M. Ry. Co.*, 91 Mich. 351, 51 N. W. 1063; *MacGinniss v. Boston & M. Consol. Copper & Silver Min. Co.*, 29 Mont. 428, 75 Pac. 89; *Coler v. Tacoma Ry. & Power Co.*, 64 N. J. Eq. 117, 53 Atl. 680.)

A distribution of all the assets would clearly be a winding up which could be done legally only in the method provided by law. (*Butler v. New Keystone Copper Co.* (Del. Ch.), 93 Atl. 380.)

SULLIVAN, C. J.—This action was brought by the minority stockholders of an Idaho corporation, who demanded the appointment of a receiver, the dissolution of the corporation and a division of the property or assets of the corporation. Judgment was for the defendants. The appeal is from the judgment.

The following facts appear from the record:

The Callahan Mining Company, the defendant corporation in this case, was organized under the laws of Idaho in June, 1910, to do a general mining business. The term of its corporate existence was fixed at fifty years. Its stock, consisting of 1,500,000 shares, was originally issued to James F. Callahan and John Callahan in equal amounts and in exchange for certain mining property situated in Shoshone county. Each of the Callahan brothers thereupon donated 200,000 shares of his allotment to establish a treasury fund. On September 19, 1910, the Callahan Mining Company entered into an option agreement with the plaintiffs A. L. Riley and J. H. Robbers for the sale to them of this 400,000 shares of treasury stock, at twenty-five cents per share. This stock was placed in escrow, subject to delivery as payments upon it were made. Under this agreement 224,000 shares were paid for and delivered to Riley and Robbers. The delivery of the remaining 176,000 shares has been the subject of litigation in another suit, which was decided in favor of Riley and Robbers in the lower court.

The directorate of the Callahan Mining Company consisted of three members. On October 30, 1913, James F.

Callahan, Frank Boutin and John Callahan were elected directors, and the two first named were directors at the time of the trial. James F. Callahan had also been president during that period and Frank Boutin vice-president. J. H. Robbers was secretary from some time in 1911 until February 1, 1915. Prior to February 1, 1915, John Callahan sold his stock and resigned his directorship, and on that date Francis C. Boutin, a son of Frank Boutin, was elected at a meeting of the directors to take the place made vacant by the resignation of John Callahan.

Mining claims adjoining the Callahan property were owned by a corporation known as the Interstate Silver Lead Mining Company. For some time prior to August 8, 1912, negotiations had been in progress, looking to the consolidation of the interests of these two mining companies, and, upon that date, the Callahan Mining Company transferred all of its mining property and equipment to a new corporation, which had theretofore been formed for that purpose, designated as the Consolidated Interstate-Callahan Mining Company, which will be hereafter referred to as the Consolidated company. About the same time the Interstate Silver Lead Company also made a complete transfer of its mining property and equipment to the Consolidated company, which is a corporation organized under the laws of Arizona, with a capital stock of 500,000 shares. Each of the old mining companies interested in this merger received in exchange for its mining property 250,000 shares in the Consolidated company. Each of the old companies also transferred back to the new company 80,000 shares of such capital stock to constitute a treasury fund for the development of their former mining properties, which had passed into the ownership of the Consolidated.

Although the Callahan Mining Company had thus sold and conveyed all its mining property and equipment to the Consolidated company nearly three years prior to the trial of this case in the lower court, and had not attempted in the interim to conduct any mining business, no proceedings had been initiated looking to the dissolution of the corporation or the distribution among its stockholders of the shares which

were received from the Consolidated in exchange for its property.

The plaintiffs in this case may be designated as the minority stockholders of the Callahan Mining Company. Their complaint alleges that there is no further excuse or necessity for continuing the existence of the Callahan Mining Company; that the holding of stock in another corporation is not one of the functions for which it was organized; that it has no debts that cannot be paid and no outstanding contracts; that the cash in its treasury amounts to approximately $71,982.32; that there is no reason why the assets should not be distributed and the corporation dissolved. The complaint also contains allegations of conspiracy on the part of the directors to appropriate and utilize the funds of the corporation for their own use and benefit to the damage of the minority stockholders, and particularly in authorizing a loan of $20,000 to the Boutin Timber Company, alleged to be financially embarrassed, which was controlled by Frank Boutin; that said directors have already involved the defendant corporation in expensive litigation, and that if they are allowed to continue their alleged mismanagement and wrongful conduct the assets of the corporation will be dissipated and plaintiffs will suffer irreparable injury; that by reason of the fact that the defendants, James F. Callahan and Frank Boutin, control a majority of the stock, they can continue to elect themselves and Francis C. Boutin as directors and thereby control the affairs and assets of the corporation for their own use and benefit in disregard of the rights of the plaintiffs as stockholders, and that they will do so; that plaintiffs will be denied participation in the assets of the corporation, or from receiving any returns therein, and from voting any of said 170,000 shares of said stock in the Consolidated company, unless a receiver is appointed.

The complaint prays for the appointment of a receiver, the dissolution of the corporation and the distribution of its property, and such other and further relief as it may be entitled to. A receiver, pending the litigation, was denied by the lower court.

During the trial the plaintiffs amended paragraph 8 of their complaint as follows:

"That at the time the stockholders of the Callahan Mining Company agreed to the sale of the property, as aforesaid, and as a consideration of their consent thereto, it was specifically understood and agreed between them, and each of them, that the 170,000 shares of the stock of the Consolidated Interstate-Callahan Mining Company received therefor should be immediately distributed *pro rata* among the stockholders of the Callahan Mining Company in proportion to their holdings in said company as soon as said sale should be completed. That subsequently the stockholders of said Callahan Mining Company agreed that the said distribution should be postponed until the said Consolidated Interstate-Callahan Mining Company should have been financed, which was accomplished prior to the commencement of this action."

The answer of the defendants, admitting the allegations of the complaint in regard to the organization of said mining companies, denies specifically the allegations of conspiracy and mismanagement. It alleges that the holding and voting of the stock of another corporation was one of the purposes of its incorporation, and that it proposed to continue the exercise of its corporate and legal functions. It is further alleged that the defendants, as directors of the Callahan Mining Company, have always in good faith endeavored to protect the interests of the Callahan Mining Company in the Consolidated company for the best interests of both companies and their stockholders. It is denied that the cash in the treasury exceeds the sum of about $26,000, or that the cash and assets could be easily distributed among the stockholders, or that there is necessity therefor. It is further alleged that a corporation known as the American Metals Company, "one of the largest zinc, smelting, mining and selling companies in the world," has made various attempts to secure the control of the Consolidated company, and also the Callahan Mining Company, by means of and through the assistance of the plaintiffs Robbers and Percival; that the interests of the American Metals Company, as a buyer of ore, are adverse and

hostile to those of the two mining companies in question, and that it would be unsafe for the stockholders of said mining companies to allow the control thereof to pass into the hands of said American Metals Company.

The pleadings contain other allegations which are elaborated with much detail but are not material to what we conceive to be the main issues in this controversy.

The case was tried to the court, which found in favor of the defendants upon most of the material allegations of the complaint. The application for a receiver was denied, and the right of the defendant corporation to continue holding and voting the 170,000 shares of Consolidated stock was upheld. The court also found that there had been no preliminary understanding among the Callahan stockholders regarding a *pro rata* distribution of the Consolidated stock; that the acts of the defendant directors were not fraudulent, "and that such steps as the defendants have taken have been in the exercise of their judgment and discretion and in good faith." Their attempted loan of the funds of the corporation to the Boutin Timber Company was, however, held to be *ultra vires*. The Callahan Mining Company was enjoined pending appeal to dispose of any of its holdings of Consolidated stock, but allowed to continue voting the same.

Appellants have made many assignments of error. These assignments go specifically to the findings and decision of the court, to the admission and rejection of certain evidence, and to the omission of the court to find upon all the material issues raised by the pleadings. They also present many specifications wherein they allege insufficiency of evidence to support the findings of fact and conclusions of law made by the lower court. We shall consider only the more important assignments which are decisive of the case.

Plaintiffs' allegations to the effect that prior to the time the Callahan Mining Company transferred its property to the Consolidated, there was an understanding among the stockholders that the Consolidated shares which were received in payment for their property should be distributed *pro rata* among the stockholders of the Callahan company, and that

this understanding was the consideration for their consent to the transfer, are not supported by the evidence, which is very conflicting in regard to this matter. The trial court was justified in finding that there was no such understanding among the stockholders.

On the other hand, the defendants failed to prove the allegations of their answer with regard to the alleged attempts of the American Metals Company to gain control of the Callahan and Consolidated mining companies, with results detrimental to the interests of their stockholders. The trial court made no finding upon this issue, concerning which there was also a marked conflict in the testimony, but his failure to do so does not affect our consideration of the merits of the case, as we view it.

Plaintiffs' allegation of conspiracy among the defendant directors, for the purpose of appropriating and utilizing the funds of the defendant corporation for their own use and benefit, to the detriment and damage of the plaintiff stockholders, upon which the court also found in favor of defendants, presents a serious question, in consideration of the proof adduced. In regard to this issue the undisputed evidence discloses the following facts:

There was at the time of filing the complaint in this case and for some time prior thereto, a considerable amount of cash in the Callahan treasury. The answer admits about $26,000 so held. Most of this appears to have been derived from payments by plaintiffs Riley and Robbers on their contract for the treasury stock. On December 4, 1914, Vice-president and Director Frank Boutin wrote to President and Director James F. Callahan from Bayfield, Wisconsin, as follows:

"Now as to borrowing the Callahan cash, the easiest way to do this is to give Mr. John Callahan a couple shares and let him retain the office of treasurer. The Boutin Timber Co. can borrow eighteen or twenty thousand for which I will put up my Callahan stock as security on the basis of 40 cts. or 50 cts. a share and the Timber Company can loan you [what you] want of it up to one half at the same rate of interest

and you put up your Callahan stock as security at the same
rate as I do say 40 cts.

"Now Jim think this over and if you or your attorney has
a different scheme from this I would like to have it.

"The notes to be made for one year at five per cent payable semi-annually.

"There may be an advantage in this deal in its keeping the
corporation alive beyond next August, for there was talk at
the meeting of Riley taking up his stock next summer."

Director James F. Callahan, to whom this letter was addressed, was not averse to the "scheme" or "deal" therein
proposed, as appears from his testimony on direct examination, as follows:

"Mr. Boutin was in favor of doing something with the
money that was laying idle in the bank, and had made application to the board, and Mr. Wourms was attorney, and he
said that could not be done, because that was part of the company assets.   But Mr. Boutin thought something ought to be
done with it if the company was secured; it ought to be drawing some interest until we could get enough ahead to be
worth investing in anything; so he said the Boutin Lumber
Co. would give their notes, with Callahan stock for security,
and that ought to be good enough security to loan to the
Boutin Lumber Co.   I told him good security was what I was
after.   So after discussing the matter I told him that if the
company didn't pay any dividend I would have to put up
some mining stock to get money.   He said the Boutin Lumber
Co. would loan me a proportion of five thousand.   All I
wanted was to have the money earning something; that's all
we were discussing it for."

Less than two months after Vice-president Boutin had
written to President Callahan as above set forth, and on February 1, 1915, a special meeting of the board of directors of
the Callahan Mining Company was held in Wallace at the
office of Mr. John H. Wourms, which had theretofore been
their regular meeting place.   Plaintiff J. H. Robbers, a large
stockholder and secretary of the company since 1911, was not
notified of this meeting, although he was in the city at the

time.   The first act of the meeting was to elect Frank Boutin secretary thereof, after which it adjourned from Mr. Wourms' office to meet immediately thereafter at the office of J. E. Gyde.   Upon being called to order in Mr. Gyde's office, a resolution was adopted by which, after reciting that John Callahan had disposed of all his stock and resigned as director and treasurer, it was resolved that such resignation be accepted and that Francis C. Boutin (a son of Frank Boutin) be elected a director and treasurer to fill the vacancy.

The next step in the proceedings was the adoption of a resolution removing Robbers as secretary and electing Francis C. Boutin in his place, on the ground, as recited in the resolution, that "it is deemed expedient and for the best interests of this corporation that the secretary and treasurer of this corporation be a member of the board of directors."   A resolution was then passed permanently removing the office of the corporation from the office of Mr. Wourms to the office of Mr. Gyde.   This was followed by the adoption of a resolution authorizing President Callahan to vote the 170,000 shares of the Consolidated on behalf of the Callahan Mining Company for an unlimited period at any meeting of the Consolidated and to give a proxy therefor in case of his absence. Thereupon a resolution was adopted to accept the offer of the Boutin Timber Company, "a corporation of the state of Wisconsin," to borrow from the Callahan Mining Company $20,000 for one year, with interest at the rate of 5% per annum, such loan to be evidenced by a promissory note and secured by "such collateral to secure the payment thereof, as may be approved by the president of this corporation."

On March 8th thereafter the complaint in this case was filed, and on April 7th the lower court made an order by which the Callahan directors were restrained from disposing of the corporation's assets pending the suit.   On April 20th the directors rescinded the resolution last above referred to.

The defense of the defendant directors to the allegations of conspiracy and attempted fraud, both in their answer and as disclosed by the evidence, is that they were as a mat-

ter of fact disinterested in their conduct, and that they were solicitous only that the idle funds of the corporation might be drawing interest on good security; that the Boutin Timber Company was a solvent corporation with abundant assets, and that Mr. Frank Boutin himself was worth more than a million dollars; also, that Robbers himself had previously suggested to them the borrowing of these funds. This, however, was denied by Robbers.

It seems never to have occcurred to these officers and directors of the Callahan Mining Company that their relation to the stockholders of that company was a fiduciary one, that the funds of the corporation intrusted to them by the stockholders constituted a trust fund, and that they were violating one of the most elementary principles of trusteeship in proceeding to loan these corporate funds to themselves. Yet as President Callahan himself testifies, they had been previously advised by Mr. Wourms, their corporation attorney, that the proposed loan would be illegal. The incident is only too illustrative of certain methods in corporate finance which have done so much of late years to bring corporate management into disrepute. It may be possible that these directors and officers did not actually intend to do anything fraudulent or illegal, but it is an old rule that where the violation of a trust is shown, the corrupt intent is presumed. Officers and directors of a corporation, like other men, must be judged by their acts.

The courts have uniformly held that the domination of a corporation by a majority organized to carry out some particular purpose or policy imposes upon such majority the obligation to exercise a high degree of good faith and diligence in thus controlling the affairs of the corporation, in which all the stockholders are mutually interested. As was said in the case of *Jones v. Missouri-Edison Electric Co.*, 144 Fed. 765, 75 C. C. A. 631:

"A combination of the holders of a majority or of three-fifths of the stock of a corporation to elect directors, to dictate their acts and the acts of the corporation for the purpose of carrying out a predetermined plan places the holders of

such stock in the shoes of the corporation and constitutes them actual, if not technical trustees for the holders of the minority of the stock. The devolution of power imposes correlative duty. The members of such a combination become in practical effect the corporation itself because they draw to themselves and use the powers of the corporation.''

See, also, 4 Thompson on Corporations, sec. 4622; *Ponca Mill Co. v. Mikesell*, 55 Neb. 98, 75 N. W. 46; *Wheeler v. Abilene Nat. Bank Bldg. Co.*, 159 Fed. 391, 89 C. C. A. 477, 16 L. R. A., N. S., 892, 14 Ann. Cas. 917, and cases cited.

In view of the facts disclosed by the record in this case, we are forced to the conclusion that finding No. 19 of the lower court ''that the acts of the defendants as members of the board of directors of the defendant corporation were not fraudulent, and that such steps as the defendants have taken have been in the exercise of their judgment and discretion and in good faith,'' was not sustained by the evidence.

When these proceedings of the directors became known to the minority stockholders, the news must inevitably have aroused in them the gravest apprehensions as to the security of their investment. Although holding nearly one-half of the stock of the company, they found themselves without representation on the board. At a secret meeting of their directors they had been ousted from the only executive office held by one of them, thereby effectually precluding them from any direct participation thereafter in the business of the corporation. It became known to them that at the same secret meeting their directors had attempted to illegally dispose of the greater part of the corporation's cash assets. They were therefore wholly justified in forecasting their future prospects as stockholders in this corporation by the light of their past experience with these directors and officers, and in seeking the interposition of a court of equity to relieve an intolerable or dangerous situation.

We must accordingly conclude that finding No. 15 of the lower court, ''That there is nothing to show that defendant corporation or the individual defendants will use the money or the assets of the defendant corporation for the personal

or individual advantage or profit of the individual defendants or to the loss of the plaintiffs," is not sustained by the evidence.

It is vigorously contended by counsel for appellants that the Callahan Mining Company, under the general corporate powers granted by its articles of incorporation, has no authority to hold and vote the stock of another corporation, particularly in view of the fact that it has for a period of three years wholly discontinued the mining operations for the purpose of which it was organized, the holding and voting of the 170,000 shares in the Consolidated being at the present time the only way in which its corporate powers are attempted to be exercised. On referring to its articles of incorporation we find that art. II thereof is as follows:

"That the purpose for which the said corporation is organized is to purchase, locate, lease, or otherwise acquire mines, mining claims, mining rights, water rights and lands and any interest therein, and explore, work, exercise, develop and turn to account the same; to quarry, mine, smelt, refine, dress, amalgamate and prepare for market, ore, metal and mineral substances of all kinds, and to carry on any other operations or business which may seem necessary, convenient or incidental to any of the objects of the company; to buy, sell, manufacture and deal in minerals, plants, machinery, implements, conveniences, provisions and things capable of being used in connection with the mining or other operations of this corporation, or required by workmen and others employed by the company, to construct, carry out, maintain, improve, manage, work, control, and superintend, any roads, ways, railways, bridges, reservoirs, watercourses, aqueducts, wharves, furnaces, mills, crushing works, hydraulic works, factories, warehouses, and other works and conveniences which may seem necessary, convenient or incidental to any object of the company and to contribute to subsidize, or otherwise aid or take part in any such operations, and in general to carry on any other business in connection therewith, whether mining, manufacturing or otherwise, and to generally exercise all the rights, powers and privi-

leges now or which may hereafter be conferred by law upon corporations organized under the laws of the state of Idaho and to do any and all things herein set forth as principal, agent, contractor, trustee, or otherwise, within the state of Idaho and any other state or territory of the United States of America or elsewhere.''

On the other hand, counsel for respondents contend that sec. 2769, Rev. Codes, as amended (Sess. L. 1909, p. 163), specifically gives the Callahan Mining Company the right to hold stock in another corporation. That part of the section to which attention is called is as follows:

''Every corporation, as such has power: . . . .

''Fourth. To purchase and hold such real and personal estate as the purposes of the corporation may require, not exceeding the amount limited by this title; and to sell, lease, assign, transfer, mortgage, or convey, any rights, privileges, franchises, real or personal property of the corporation, other than its franchises of being a corporation; *and to purchase, own, vote, sell or hypothecate the stock and bonds of other corporations.''*

We think, however, that the very broad powers conferred upon corporations ''as such'' by this section of the statute, including subd. 4 of the section as above set forth, must always have relation to the purpose for which any particular corporation is formed. For instance, under subd. 8 of this section, a corporation is given power ''to enter into any contracts or obligations essential, necessary or proper to the transaction of its ordinary affairs, or for the purposes of the corporation.'' The power to contract is thus given a wide range, and yet it is limited to the purposes of the corporation. In the case at bar the lower court therefore properly held that the contract whereby it was proposed to loan the corporate funds was *ultra vires,* as not being related to any legitimate purpose for which the corporation was formed, inasmuch as the defendant corporation is a mining and not a loan company; and even though the design of the transaction in question was merely to obtain a return on the idle funds of the corporation, it was still outside of both the ex-

press and implied contractual powers of the company. We do not think the legislature intended by the authorization to any corporation "as such" to "purchase, own, vote, sell or hypothecate the stock and bonds of other corporations," to confer a general grant of power wholly irrespective of the purpose for which the corporation might be organized. The statute (sec. 2714, Rev. Codes) requires the articles of incorporation to state the purpose for which the corporation is formed. This is required not only to inform the sovereign power from which the corporation derives its right to exist, but also for the purpose of formulating in a solemn and binding manner the contract of association between the incorporators. If the amendment to subd. 4 of sec. 2769 has the general and unrestricted application to all corporations which counsel seems to contend for, it would be possible for a designing promoter to persuade others to invest their capital and associate themselves with him in the corporate relation for a purpose specified in the articles of incorporation, and thereafter abandon entirely the specified purposes of the charter and use the corporate assets and the corporate machinery for purposes entirely different from those which constituted the consideration for the association of these individuals when they subscribed to the original articles. And to enable him to do this he would need to control only fifty-one per cent of the stock.

Counsel contends, of course, that inasmuch as the Callahan Mining Company sold its property and abandoned the mining operations for which it was organized only to acquire in exchange therefor a block of stock in another mining corporation, doing the same character of business and even mining the same ground, it is not subject to the charge of having deviated to any obnoxious extent from the purposes expressed in its articles of incorporation. We are inclined to think there is much force in this contention, and are not disposed to lay down any absolute rule to the effect that such a corporation as the Callahan Mining Company may not legally exchange its property for stock of another corporation doing the same character of business, and thereby

become a holding corporation only, at least for a reasonable period of time and as an incident to winding up its affairs and distributing its assets among the stockholders. But if it may do this for three years against the protests of minority stockholders who insist on a distribution of the assets, it may do it for five, or fifteen, or fifty. The fact, therefore, that the corporation has to this extent deviated from the purposes for which it was incorporated, and that it insists upon continuing to do so against the emphatic protests of nearly half the stock ownership, is a circumstance to be taken into consideration in weighing the degree of relief to which the minority stockholders are entitled under this form of action.

In its last finding of fact, No. 20, the court found as follows: "The court further finds that the defendant corporation and the stockholders of said company as such and the directors as such in the manner provided by law have never indicated or taken steps to discontinue the existence of the defendant corporation, *and has engaged in no business for which it was organized since said date.*" This finding is inconsistent with the theory that the holding of stock in the Consolidated was business for which it was organized, as indicated by some of the other findings, but it has evidence to sustain it and will not be disturbed by this court.

Counsel for respondents have cited many authorities of high respectability in their brief in support of the contention that a court of equity is powerless to grant permanent relief to minority stockholders under the facts shown by the record in this case. This contention is well expressed in a quotation from the opinion of the court in the case of *Dudley v. Dakota Hot Springs Co.*, 11 S. D. 559, 79 N. W. 839, wherein the court said: "It is the settled doctrine that, at the suit of a stockholder, corporate officials cannot be removed, nor a receiver be appointed, nor the existence of a corporation be in any manner terminated, by a court of law or equity, in the absence of express statutory authorization."

In the case of *Gibbs v. Morgan*, 9 Ida. 100, 72 Pac. 733, it appeared that the corporation in question was not in active operation, that its capital stock was equally divided between

contending factions, and that most of its assets was in cash. This court sustained the lower court in the appointment of a receiver, and cited subd. 6 of sec. 4329, Rev. Codes, to the effect that in addition to the grounds specified in said section a receiver may be appointed in all other cases where receivers have heretofore been appointed by the usages of courts of equity. The court also referred to authorities holding "that there may be circumstances under which a court of equity may appoint a receiver and wind up a corporation at the suit of a stockholder, even in the absence of a statute," and in conclusion it is said: "The early doctrine that the affairs of a corporation could not be inquired into except by permission of the attorney general, and that courts of equity should not interfere with the power and authority of the directors of a corporation because that would result in its dissolution has been modified to meet existing conditions."

The doctrine of this case is approved in *Hall v. Nieukirk,* 12 Ida. 33, 118 Am. St. 188, 85 Pac. 485, and the court there cites and comments on the case of *Miner v. Belle Isle Ice Co.,* 93 Mich. 97, 53 N. W. 218, 17 L. R. A. 412, which furnished an instance of a gross abuse of corporate trust extending over a period of several years, and wherein Justice McGrath in writing the opinion said: "I think a court of equity, under the circumstances of this case, in the exercise of its general equity jurisdiction, has the power to grant to this complainant ample relief, even to the dissolution of the trust relations. . . . . A receiver will be appointed and the affairs of this corporation wound up."

Counsel for respondent contends that the mere cessation or suspension by a corporation of corporate business will not of itself operate as a dissolution of the corporation or a forfeiture of its corporate rights, and that the fact of dissensions having occurred among the stockholders is not *per se* ground for the interference of a court of equity. These contentions as statements of general principles are undoubtedly correct. But the difficulty in this case goes deeper than mere discontinuance of the business for which the corporation was formed or disagreement and strife among the

stockholders. Both of these elements are present, and in
addition to them a circumstance more serious than either,
that is to say, a concerted and deliberate attempt on the
part of the majority, which has controlled all the directors
and officers of this corporation in its own interest, to not
only ignore the minority stockholders in the corporate policy,
but to pursue a course of conduct both prejudicial to the
minority stockholders and of itself illegal and *ultra vires.*
It is true that the performance of the particular *ultra vires*
act was enjoined by the lower court, but with the control
of the corporation remaining in the hands of the same fac-
tion, the minority stockholders, with no representation on
the board of directors and no voice in the management of
corporate affairs, have little assurance against the attempted
perpetration of similar acts, and should not be compelled
continually to resort to the equitable arm of the court to
protect their rights.

The situation of the hostile factions in this corporation
is analogous to that of a marital partnership where irrecon-
cilable dissensions have finally developed into attempted
wrong and oppression on the part of the stronger party. In
such cases courts of equity do not hesitate to dissolve the
bond of association where it clearly appears that only harm
can result from its continuance. Yet the marriage relation
is the most sacred and the most favored form of contractual
association known to our law. Is there, then, anything
sacrosanct about a corporation as a form of association?
We think not. It is only another means of associating men
together under the forms of law for the achievement of a cer-
tain purpose, and when the purpose has manifestly failed,
the compulsion to remain associated may as well be relaxed.

Counsel on both sides have cited many cases where the
interposition of equity was sought to relieve the troubles
to which private corporations are subject, relief being denied
in some instances and granted in various ways in others.
We have examined these cases and find none which exactly
resembles the facts of the case at bar. From its very nature,
and in order to attain its objects equity must often act without

specific statutory authority and sometimes without legal precedent. Each case must stand on its own facts, and the degree of relief applied must be commensurate with the wrong to be remedied. As remarked by Mr. Justice Field in *Sharon v. Tucker*, 144 U. S. 533, 12 Sup. Ct. 720, 36 L. ed. 532, in quoting from Pomeroy's treatise on Equity Jurisprudence: "It is absolutely impossible to enumerate all the special kinds of relief which may be granted, or to place any bounds to the power of the courts in shaping the relief in accordance with the circumstances of particular cases."

We shall not in this case compel the dissolution of the defendant corporation, but we conclude that plaintiffs are at least entitled to such a measure of equitable relief as will require the defendant corporation to reduce its capital stock to the extent required in order to enable it to distribute among plaintiffs, in exchange for the surrender and cancelation of their share certificates, a proportionate share of the corporate assets, after all the corporate obligations are paid. The stockholders will at once take the proper statutory proceedings to reduce their capital stock accordingly. If they prefer to dissolve the corporation altogether, they may of course exercise their statutory rights in that respect, but it is not the purpose of this decision to force them to do so.

The order of the lower court enjoining any disposition by defendants of the corporation's assets pending this litigation, or the making of any contract relative thereto, will remain in force, and defendants will be further enjoined from voting the 170,000 shares in the Consolidated Interstate-Callahan Mining Company, or any part thereof, until such distribution is effected.

The case is reversed and remanded to the lower court, with direction to enter a decree requiring the stockholders of the Callahan Mining Company to pursue the course above indicated. The trial court may also appoint a receiver to take charge of the property pending distribution upon proper showing, if in view of all the circumstances such appointment

appears to him to be necessary to protect the assets. Costs are awarded to appellants.

Morgan, J., concurs.

Bryan, District Judge, sat at the hearing of this case, and concurs.

### ON PETITIONS FOR REHEARING.

#### (March 10, 1916.)

PER CURIAM.—Petitions for rehearing have been filed not only by respondents but by John P. Gray, Esq., one of the stockholders of the Callahan Mining Company, and by Messrs. Walter H. Hanson and A. H. Conner, who appeared for that purpose as friends of the court, and upon consideration we find no sufficient reason for granting a rehearing, but conclude that a somewhat clearer and more specific direction may not be amiss than appears in the foregoing opinion for the disposal of the case in the district court.

It is ordered that upon the filing of the *remittitur* in this case the lower court enter its decree in accordance with the judgment of this court, giving the directors and stockholders of the defendant corporation a reasonable time, not to exceed sixty days, within which to commence and complete proper statutory proceedings to reduce the capital stock of said corporation so as to enable it to distribute among plaintiffs, in exchange for the surrender and cancelation of their share certificates, a proportionate share of the corporate assets after all the corporate obligations are paid; or, if said directors and stockholders elect to dissolve said corporation, that they be given a reasonable time, not to exceed ninety days, within which to commence and complete statutory proceedings to dissolve said corporation; and in the event of their failure, neglect or refusal to commence, diligently prosecute and promptly complete proceedings to reduce the capital stock or to dissolve the corporation in accordance with the decision

of this court, the trial court is hereby directed to appoint a receiver to take charge of the assets of said corporation, and to take such other steps as may be necessary to close up its affairs and dissolve it.

The petitions for rehearing are denied.