(No. 6673.   September 30, 1939.)

STATE ex Rel. J. W. TAYLOR, Attorney General, Respondent, v. BENEFICIAL PROTECTIVE ASSOCIATION, INC., a Corporation, Appellant.

[94 Pac. (2d) 787.]

588

Merrill & Merrill, for Appellant.

J. W. Taylor, Attorney General, and R. W. Beckwith, Assistant Attorney General, for Respondent.

HOLDEN, J.—The 1933 session of the legislature passed an act entitled "An act providing for the organization of benefit associations; providing for a minimum membership fund and bond necessary before authorization to do business; providing for the amount and method of collecting membership fees, annual dues and assessments, and a fund for the payment of benefits to members or beneficiaries of members; providing conditions of issuance, revocation and status of certificates of membership; providing certain exemptions; providing for the regulation thereof by the bureau of insurance; providing fees to be paid by said association; prohibiting foreign benefit associations doing business in this state; providing penalties for violations; and repealing all acts in conflict therewith." (Chap. 110, Sess. Laws 1933, p. 171, approved February 28, 1933.)

In January, 1934, appellant Beneficial Protective Association, incorporated under the provisions of chapter 110, *supra*. Immediately following its incorporation, appellant, hereinafter called the "Association," began issuing what may be termed mutual assessment benefit policies in accordance with the provisions of that chapter. Later on, however, it commenced to issue, and is still issuing, what are denominated "Premier Policies" and "Service Policies," and two funds have been maintained for the payment of benefits arising under the policies so issued by the Association.

About three years after incorporation certain of the officers of the Association began borrowing corporate funds on unsecured promissory notes and on open account. A. Y. Satterfield, Vice-President and General Manager, borrowed the following amounts on his unsecured notes: October 5, 1936, $1,400; November 23, 1936, $2,000; December 14, 1936, $800; April 12, 1937, $1,800; June 5, 1937, $1,000. September 30, 1935, George C. Yates and R. S. Satterfield, Secretary-Treasurer of the Association and a son of A. Y. Satterfield, borrowed $2,500 upon an unsecured note. R. S. Satterfield and George C. Yates borrowed on open account, without written evidence of the indebtedness, $2,000; R. S. Satterfield, on open account, $792; A. Y. Satterfield, on open account, $202.10. February 1, 1937, W. P. Whitaker, President of the Association, borrowed upon an unsecured note the sum of $500.

August 5, 1937, the State of Idaho, on the relation of J. W. Taylor, Attorney-General, filed a complaint against the Association, in which it was alleged, among other things, that: The Association exercised authority, not conferred upon it, in violation of said chapter 110, in that it had issued and had outstanding, large numbers of certificates providing for a level premium, denominated ''Premier Certificate''; that in pursuance of the provisions of the Premier Certificate the Association allocated 70 per cent of the premiums to the benefit fund for the payment of claims and had maintained for that purpose a separate benefit fund distinct from the benefit fund maintained for the purpose of the retirement of claims arising under policies conforming to the provisions of chapter 110; that the Association maintained two separate benefit funds for the payment of death claims, one for the payment of claims arising under level premium certificates, and the other for payment of claims arising under assessments under contracts conforming to the provisions of said chapter 110; that the Association had abused the authority conferred upon it by chapter 110 to ''loan such funds as it may have on hand'' in that it had loaned funds to certain of its officers; that chapter 110 authorized the creation and maintenance of but one fund, to wit: ''A fund for the pay-

ment of claims for benefits'' and that in disregard of such limitation and in excess of the powers conferred upon it by chapter 110, the Association had created and maintained two separate funds for the payment of claims, to participation in which some members of the Association were admitted and others were not, and that the Association was not operating upon a mutual basis, as provided by said chapter; that on July 1, 1937, there was outstanding death claims against the Association amounting approximately to $18,350 and a deficit in the fund for the retirement of claims in the sum of $10,754.29; that the Association was insolvent; that the action was brought by the authority of section 29–157, I. C. A.

August 21, 1937, the Association demurred to the complaint upon the ground it did not state facts sufficient to constitute a cause of action. October 16, 1937, the demurrer was overruled.

The Association filed its answer January 6, 1938. It alleged it had issued a limited number of Premier Certificates, but denied that the certificates provided for a level premium or that such certificates violated the provisions of chapter 110; it also alleged that from the dues paid, as provided in the Premier Certificates, it had placed the major portion in a benefit fund to relieve the necessity of imposing assessments, except in emergencies and that the balance of said dues had been used in defraying expenses of operation of the business; that that method had been acquiesced in and approved by the Manager of the Bureau of Insurance and was also in harmony with chapter 110; it admitted it had created two separate funds for the payment of claims, one for the payment of claims that might arise under the Premier Certificates and one for the payment of claims which might arise under other certificates; admitted that on July 1, 1937, there were outstanding claims amounting to approximately $18,350, but alleged that following the filing of the complaint, assessments had been levied and collected and all claims paid; also admitted it had made the above mentioned loans but that they were made to said persons as individuals and not as officers of the Association and alleged the money so loaned had been repaid or adequately secured.

It denied it was insolvent or had abused the authority conferred upon it by chapter 110.

June 9, 1938, the cause was tried. October 21, 1938, findings of fact and conclusions of law were made and filed and judgment thereon entered. By its decree the trial court commanded appellant:

"1. To confine its operations strictly to the plan of operation expressly authorized by the provisions of Chapter 110 of the 1933 Session Laws.

2. To refrain from attempting to exercise any power not expressly granted to it by law or which is not incidental to the exercise of any such power so expressly conferred, and to refrain from holding itself out to the public or its members as exercising any powers in excess thereof.

3. To desist from writing or the issuance of any more of its Premier Certificates or any other form of certificate or policy providing for a level premium.

4. To desist from writing or the issuance of any certificate or policy which provides for the payment of benefit assessments in any manner or form, except as expressly authorized by Chapter 110, 1933 Session Laws.

5. To refrain from charging as dues, payable by any of its members, more than can reasonably be anticipated as being necessary to pay such member's proportionate share of the operating costs of the corporation, exclusive of benefit payments.

6. Not to collect in the guise of dues, funds for the benefit fund of such corporation. But this shall not be construed as prohibiting the transfer of surplus funds from dues fairly levied into the benefit fund of the corporation.

7. To desist from making any loans of its corporate funds to any of its officers or directors.

8. To maintain only one fund from which all legal claims for benefits shall be paid pursuant to the provisions of Chapter 110, 1933 Session Laws, and without class distinction or preference."

From the judgment and decree so entered the Association appealed to this court.

It is urged:

"The complaint fails to state facts sufficient to constitute a cause of action or support the relief demanded by the plaintiff, more particularly because there is no allegation of any Notice or demand served upon the defendant of any objections to the method of its operation or any opportunity given to it to show cause why proceedings should not be commenced and there are no allegations of any complaint made by any member or stockholder of the defendant corporation or that it had not complied with any requirement of the Department of Insurance of the State."

And it is argued that section 29–157, I. C. A., is a part of the Business Corporation Code (Tit. 29, chaps. 1 to 13, I. C. A.) and "has nothing to do with procedure and does not control the allegations to be made in a complaint" against an association organized under the provisions of chapter 110, *supra;* that "Section 29–157, I. C. A., does not outline the procedure to be followed by the Attorney-General. Chapter 110 of the 1933 Session Laws makes no reference to it. Yet, when these two statutes are read in connection with the theories of *quo warranto* proceedings and other statutes of the Code, we think it abundantly clear that before such an action is instituted notice should be given the defendant."

Section 29–157, I. C. A., provides:

"*Action to annul, vacate, or forfeit corporate franchise.*— 1. The attorney-general may bring an action against any corporation to procure a judgment annulling, vacating or forfeiting, as the case may be, its articles of incorporation and franchise upon the ground that:

"a. The corporate franchise was procured through fraud practiced upon the state; or

"b. The corporation has violated any provision of law whereby it has forfeited its franchise; or,

"c. The corporation has exercised authority not conferred upon it, or abused authority conferred upon it; or

"d. The corporation has done or omitted any act which amounts to a surrender of its corporate franchise, has failed

or discontinued to exercise its corporate privileges or has abandoned the corporate enterprise.

"2. In any such action, the court may grant the relief asked for, or such other or partial relief as to it seems just and expedient."

Section 40–717, I. C. A., provides:

" . . . . No such proceedings (*quo warranto*) shall be commenced by the Attorney General against any such company until notice has been duly served on the officers of the company and a reasonable opportunity given to the company, on a date to be designated in said notice, to show cause why such proceedings should not be commenced: . . . . "

Section 40–2351, I. C. A., provides:

"No such proceedings (*quo warranto*) shall be commenced by the Attorney General against any such society until after notice has been duly served on the chief executive officers of the society and a reasonable opportunity given to it, on a date to be named in said notice, to show cause why such proceedings should not be commenced."

Section 40–717, I. C. A., is a re-enactment of section 66 of chapter 228, 1911 Session Laws, page 759. It was enacted to provide for the regulation and control of all companies, corporations, associations, partnerships or individuals engaged, as well as the organization, regulation and control of those desiring to engage in the insurance business in this state, excepting fraternal and benevolent orders and societies. Section 40–2351, I. C. A., is a re-enactment of part of section 24, chapter 225, 1911 Session Laws, pages 710, 723. It was enacted to provide for the organization (without capital stock and not for profit), regulation and control of fraternal and benevolent societies desiring to engage, or engaged in the insurance business for the mutual benefit of members and their beneficiaries, having a lodge system with ritualistic form of work and representative form of government.

Concerning the above-quoted provisions of sections 40–717 and 40–2351, *supra,* appellant states:

"It is not contended that the Code dealing with insurance companies or with fraternal benefit societies have application to corporations organized under Chapter 110 of the 1933

Session Laws but the foregoing quotations are made to illustrate a general principle of law, which we believe to be to the effect that before *quo warranto* proceedings shall be commenced against a corporation by the Attorney General, notice of the intended action should be given the executive officers of the corporation."

■ Appellant thus concedes the above-quoted provisions of sections 40–717 and 40–2351, *supra*, have no application to associations organized under chapter 110; we therefore proceed to consider the contention that as "a general principle of law" the attorney general must, before commencing *quo warranto* proceedings, give notice of the intended action to the executive officers of the corporation. At the common law, "leave to bring the action was granted upon the application of the Attorney General; and the court, in its discretion, directs notice of such application to be given to the corporation or to its officers, previous to granting such leave; and it may hear the corporation in opposition thereto." (Wood, 3d ed., pp. 188, 189.) But in Idaho, the common-law proceeding has been supplanted by statute (secs. 9–602 to 9–609, I. C. A.).

Section 9–602, *supra*, provides that:

"An action may be brought in the name of the people of the state against any person who . . . . exercises any . . . . franchise, real or pretended, within this state, without authority of law." (Underscoring mine.)

This court pointed out in *Toncray v. Budge*, 14 Ida. 621, 622, 95 Pac. 26, that:

"The writ of *quo warranto* was a common-law remedy, and is covered by and included in Sec. 4612 (now Section 9–602, I. C. A.) to Sec. 4619 (now Section 9–609, I. C. A.) Rev. Stat. of this state, which provide for an information in the nature of *quo warranto* to inquire into the authority by which a person holds or exercises an office or franchise, and those provisions of the statute are still in force in this state, and the jurisdiction to be exercised under these provisions of law falls within the category of 'cases both at law and in equity' as used in Sec. 20 of Art. 5 of the constitution."

And in *People v. Burnham*, 35 Ida. 522, 524, 207 Pac. 589 (an action brought for the purpose of trying title to the office of Superintendent of Public Instruction of Custer County), discussing C. S., sec. 7024 (now sec. 9–602, I. C. A.), this court further pointed out:

"This action was brought under C. S. Sec. 7024 which authorizes the prosecuting attorney to bring such an action 'in the name of the people of the state against any person who usurps, intrudes into, holds or exercises any office or franchise, real or pretended, within this state, without authority of law.' The procedure provided for by this section and several succeeding ones was enacted in substance by the first territorial legislature of Idaho, as part of the civil practice act, which was entitled, 'An act to regulate proceedings in civil cases in the courts of justice of the territory of Idaho.' Said provisions of this territorial act have been carried down from that date to the present with no changes that affect the merits of this controversy. The original act provided that the action should be brought by the district attorney in the name of the people of the United States and of the territory of Idaho upon his own information or upon the complaint of a private party. (First Ter. Sess. Acts, p. 138.) In 1875 the legislature amended this law slightly and enacted that 'the writ of *scire facias*, the writ of *quo warranto* and proceedings by information in the nature of *quo warranto* are abolished. The remedies obtainable in these forms may hereafter be obtained by civil actions under the provisions of this chapter, 'which was the chapter dealing with actions for the usurpation of office or franchise.' (Eighth Ter. Sess. Acts, 157, Sec. 333)."

The common-law proceeding by information in the nature of *quo warranto* having been abolished, it was not necessary to file an application to bring this action nor to give appellant an "opportunity to show cause why proceedings should not be commenced" as at common law and as contended by appellant. And the recital in the complaint that the action was brought under section 29–157, *supra*, is mere surplusage—it does not add anything to, nor take anything from the cause of action set out in the complaint. As held

in *People v. Burnham, supra,* the remedies formerly obtainable under the ancient writs of *scire facias* and *quo warranto* may now be obtained by civil action under (secs. 9–602 to 9–609, *supra*).

We come now to the question as to whether the Association was exercising powers in excess of those conferred by chapter 110, as charged in the complaint. The powers conferred are found in sections 5 and 8, respectively. Section 5 provides:

"MINIMUM MEMBERSHIP FUND. Said association shall not issue any contract of insurance until a minimum of five hundred (500) persons have applied in writing to said association for membership and insurance therein, and have paid an amount of not less than $5.00 nor more than $10.00 on account of their applications for membership or insurance, and that said association has on deposit in a bank or trust company authorized to do business in this state an amount equal to the largest benefit contract to be paid by it to any one member, which shall not exceed the sum of three thousand dollars, ($3,000.00) whereupon such association shall be authorized to transact business pursuant to this Act."

Section 8, provides:

"FUND, ASSESSMENTS, ANNUAL DUES, CERTIFICATE AND CANCELLATION. There shall always be maintained by said association a fund for the payment of claims for benefits, equal to the largest benefit contracted to be paid by it to any one person, which shall not exceed three thousand dollars ($3,000.00). And whenever, by reason of payment of benefit claims therefrom, said fund is reduced below that amount, there shall be levied an assessment upon the members not exceeding three dollars ($3.00), sufficient to replenish said fund to said amount. Said fund shall never be used for any purpose other than the payment of legal claims covered by contracts of insurance to members of the association or beneficiaries of such members. The benefits to be paid shall be clearly set out in each certificate issued, and shall never exceed the face value of the certificate. No certificate shall be issued providing for a level premium, guaranteed benefit nor for surrender or loan value. Each

such association may provide for the payment of annual dues exclusive of membership fees, as may be deemed best, but no member shall be subject to the payment of any annual due in excess of that established when he joined the association. Calls for assessments must specify the purpose for which made. Memberships shall be suspended for cause, only after written notice by mail, and an opportunity to be heard.''

It will be noted the largest policy which an association may issue is one for the sum of $3,000; that the association must maintain a fund not exceeding that amount for the payment of death claims; that whenever, by reason of the payment of claims therefrom, the fund is reduced below that amount, it is authorized to and must levy an assessment upon all its members sufficient to replenish the fund, but not exceeding $3. Under the statute, an association starts with a benefit fund of $3,000. When a member dies, it must pay the loss out of that fund and then levy an assessment, limited to the amount above stated, sufficient to replenish it, but death must necessarily precede the levying of an assessment in that until a death occurs there could be no claim to pay. It follows, then, that the statute provides for mutual benefit insurances, based solely upon the mutual benefit assessment plan above outlined, and that an assessment cannot be levied upon the members of an association before a death occurs. The statute does not authorize the issuance of various kinds of policies or certificates, as for instance, ''Premier Certificates'' or ''Service Certificates,'' nor does it authorize the maintenance of two funds for the payment of death claims. But one fund can be maintained, out of which all claims for benefits must be paid.

What is said in *Smith v. Republica County Mutual Fire Ins. Co.*, 82 Kan. 697, 109 Pac. 390, is pertinent here:

''The theory of an organization of this kind is mutual insurance at cost, and not the building up of a financial institution with accumulations of capital and income and profits. The money remains in the pockets of the members until needed for the purpose for which the company exists—the payment of losses. It is then called out by assessment, and any deviation from this plan violates the principle upon

which the corporation is founded. In practice it is found desirable to have always on hand a fund with which to meet losses promptly, and so the legislature provided for a limited reserve."

In its answer the Association alleged "that it loaned to the person therein named as an individual and not as an officer of the company certain sums of money set out in said paragraph (par. II of the complaint), but that the money so loaned has in all respects been repaid or adequately secured on or about the date the same became due; that said loans were made for the purpose of securing interest on unused funds and were in each and every respect legally and properly made and in pursuance of the power of the defendant granted it by law to loan its funds." And appellant insists the loans made by it to its officers and directors were authorized under the provisions of section 4, chapter 110, which provides that: " .... such association .... may loan such funds as it may have on hand .... "

In *Riley v. Callahan Min. Co.*, 28 Ida. 525, 537, 155 Pac. 665, where the directors and officers were likewise loaning corporate funds to themselves, substantially the same contention was made as is made by the Association in the case at bar. Here the defense is "that said loans were made for the purpose of securing interest on unused funds." In the Riley case, *supra,* the defense was "that they (the officers and directors) were solicitous only that the idle funds of the corporation might be drawing interest on good security." In passing on that defense, this court said:

"It seems never to have occurred to these officers and directors of the Callahan Mining Company that their relation to the stockholders of that company was a fiduciary one, that the funds of the corporation intrusted to them by the stockholders constituted a trust fund, and that they were violating one of the most elementary principles of trusteeship in proceeding to loan these corporate funds to themselves." (P. 538.)

In the Riley case, *supra,* the corporation was financially sound—in fact, it had idle funds—but in the case at bar the record shows the loans to officers and directors of the Associa-

tion totaled $12,994.10; that there were outstanding death claims amounting to approximately $18,350, and a deficit in the fund for the retirement of claims in the sum of $10,754.29. Furthermore, section 29-141, I. C. A., provides:

"Officers and directors shall be deemed to stand in a fiduciary relation to the corporation, and shall discharge the duties of their respective positions in good faith, and with that diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in like positions."

When officers and directors loan trust funds, and particularly the funds of an Association in which widows and orphans of deceased members have a vital interest, as in the case at bar, then the statute requires diligence, care and skill—that "diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in like positions." The duty to exercise such care is not discharged by loaning trust funds on open account or on unsecured notes.

Appellant also insists the decree is too general. That it should be so definite and specific as to inform it what it can and cannot do; that where one may subject himself to the perils of contempt of court for violation of an injunction, he is entitled to know specifically what the things are he is restrained from doing, as well as what the things are he is commanded to do. As will have been observed, the trial court specifically enjoined the association: From collecting in the guise of dues, funds for the benefit of the association, issuing "Premier Certificates," making any loans of its corporate funds to any of its officers or directors, and commanded that the Association maintain but one fund from which all claims for benefits shall be paid. Other parts of the decree, while general, are apparently intended to confine the operation of the Association to the plan of mutual assessment benefit insurance as provided for by chapter 110, and are, therefore, thought to be harmless.

The judgment is affirmed with costs to respondent.

Ailshie, C. J., and Givens and Morgan, JJ., concur.

Budge, J., sat at the hearing but did not participate in the decision.

Petition for rehearing denied.