# INDEPENDENCE LEAD MINES CO. v. KINGSBURY et al.

## No. 11959.

United States Court of Appeals
Ninth Circuit.

Feb. 28, 1949.

Rehearing Denied Aug. 8, 1949.

Dissenting Opinion Amended Aug. 23, 1949.

DENMAN, Chief Judge, dissenting.

R. Max Etter and William E. Cullen, both of Spokane, Wash., and Walter H. Hanson, of Wallace, Idaho, for appellant.

H. J. Hull, of Wallace, Idaho, and J. K. Cheadle, of Spokane, Wash., for appellees.

Before DENMAN, Chief Judge, and HEALY and ORR, Circuit Judges.

HEALY, Circuit Judge.

This is an appeal from an order dismissing a petition of appellant, hereafter called Independence, to vacate a judgment. The background of the litigation may be summarized as follows:

Originally the authorized capital stock of Independence consisted of three million shares of common assessable stock and one million shares of preferred. None of the preferred was outstanding. In 1932 the articles were amended by eliminating the authorized preferred stock and creating in lieu thereof one million shares of nonassessable Class A common. Upon the amendment the Class A common was issued to Mines Finance, a corporation wholly owned by two men, Kingsbury and Marquardt, who were respectively president and secretary of Independence. Kingsbury died at an unspecified date. In 1941 Mines Finance assigned two-thirds of the Class A common to Kingsbury's widow and one-third to Marquardt, and Independence issued to those individuals certificates evidencing the shares. In 1942 Marquardt died and his shares were distributed to his widow who thereupon obtained a formal transfer of the stock to herself. Thus on the books of Independence the two widows, who are appellees here, appeared as holders of all the Class A common.

Independence owned and had in its treasury 1,001,000 shares of the stock of Clayton Silver Mines Company. The common stockholders were insistent upon the distribution of the Clayton stock, or the bulk of it, as a dividend. Accordingly the directors of Independence, in August of 1944, adopted a resolution providing that 750,000 of the Clayton shares be distributed to the common stockholders on the basis of one share of Clayton to four shares of Independence. The resolution provided that the Class A common was not to participate in the distribution "for the reason that there is a question as to the validity" of that stock.

Independence commenced actively to distribute the Clayton stock and by June 1946 all but 73,175 shares of the dividend declared had been distributed.[1] Appellees in June of 1945 filed suit against Independence in the court below alleging their ownership of the Class A common, their right to participate in the dividend equally with other stockholders, and the refusal of Independence to recognize their right. They asked that Independence be ordered to distribute to them 250,000 shares of the Clayton stock together with a sum alleged to have been paid to Independence as a dividend thereon. Independence moved to dismiss and its motion was denied in November of 1945. Later, no answer having been filed by Inde-

---

[1] The resolution required that the stockholders send in their certificates in order that the receipt of the distribution might be evidenced by a stamp thereon. Some Independence shares appear for a long while to have been traded in ex-dividend on the exchange.

pendence and extensions of time given it to answer having expired, appellees moved for a default. Thereupon Independence answered.

The answer denied that the Class A common had been lawfully issued for value received or for any other consideration. It alleged that at the time of the transfer of the stock to Mrs. Kingsbury and to Marquardt the latter was the alter ego of Independence and that the transfer was made without knowledge of its other officers; and further, that at the time of the transfer of the Marquardt stock to his widow the officers of Independence were not aware of the true facts. Finally, the answer denied that the Class A common was issued or outstanding and alleged that if so it was void and of no effect.

Subsequent to the joinder of issue in the suit the parties entered into a stipulation for the entry of judgment to the effect that the claim of the appellees to 250,000 shares of the Clayton stock be rejected and that they have from Independence 170,000 shares thereof, and no more; that appellees surrender to Independence 400,000 shares of their Class A common; that it be adjudged that they are the bona fide owners of the balance, namely 600,000 shares, with rights identical to those of the common stock; and finally that Independence pay to the appellees the sum of $10,050. Judgment to this effect was entered by the court on June 29, 1946.[2]

The petition for the vacation of this judgment was filed in 1947 after the election by Independence of a new board of directors. Two of its main paragraphs were extensively amended after a motion to dismiss it had been interposed. Appellees' motion was then renewed, and Independence having declined to plead further the court dismissed the amended petition as insufficient. This appeal followed.

■ The defenses of want of consideration, invalidity and fraud in the original issuance to Mines Finance of the Class A common, as set up in the answer, are re-

peated in the petition with much evidentiary detail and in greatly amplified form. The substance of the defenses, however, is concededly identical in the two pleadings. Since fraud in this respect was in issue in the litigation concluded by the judgment it can not be made the basis of an attack on the judgment. Donovan v. Miller, 12 Idaho 600, 88 P. 82, 9 L.R.A.,N.S., 524, 10 Ann.Cas. 444; United States v. Throckmorton, 98 U.S. 61, 68, 25 L.Ed. 93; Toledo Scale Co. v. Computing Scale Co., 261 U.S. 399, 43 S.Ct. 458, 67 L.Ed. 719; 49 Corpus Juris Secundum, Judgments, § 372, pages 738–740. Independence concedes that such is the general rule, but argues in its brief that the principle is not applicable here for the reason that appellees at all times had knowledge of the invalidity of their holdings. Such knowledge, however, is not pleaded, and we need not inquire what might be its effect if it had been pleaded. There is no averment in the petition that appellees knew that fraud had been practiced by their predecessors in the acquisition of the stock; and no facts are set out which would in good conscience preclude them from resorting to the courts for an adjudication of their disputed claim.

■ The balance and bulk of the petition is devoted to an attempt to show fraud in the procurement of the judgment. On this phase Independence argues that collusion between its president on the one side and appellees on the other prevented it from making its defense. What the court has to determine is whether the contention finds adequate support in the facts alleged in the petition.[3]

■■ The petition avers that since the death of Marquardt in 1942 Independence had been under the control and domination of one Keane, its acting president; that Keane was currently disqualified to act as an officer because no longer a stockholder; and that the two other directors serving with and appointed by Keane were not stockholders, hence were also disqualified from acting. No stockholders meeting, it is

---

[2] It appears that throughout the suit Independence was represented by several attorneys.

[3] The Idaho rule, like the rule generally, is that in a proceeding of this nature the facts constituting the fraud must be definitely and positively alleged, Zounich v. Anderson, 35 Idaho 792, 208 P. 402.

said, had been held for eight years. It is averred that appellees, well knowing these facts, dealt with Keane in the settlement of their suit. From the recitals of the petition as a whole, however, it is plain that Keane and the other directors were at least de facto officers. Cf. Fletcher, Cyc. Corp., Vol. 2, Ch. 11, §§ 372–390. Keane was and for years had been in open and unchallenged possession of the office, discharging its duties under color of authority and with the acquiescence of the generality of stockholders. The latter appear to have recognized his authority to act for the corporation; and there is no allegation that they themselves were unaware of the true nature or infirmities of his tenure. The very dividend from which this litigation stemmed had been declared and was in process of distribution by Keane and his associates acting as officers and directors. The common stockholders had sought the dividend at their hands, recognized their authority to declare it, and claimed and accepted its fruits. We think Independence, speaking here ostensibly for the common stockholders, is in no position to challenge Keane's official status.

Again, it is alleged that Keane was currently engaged in the sale of large blocks of the Clayton stock held by Independence and was corruptly dissipating the proceeds or applying them to his own use. Appellees are alleged on information and belief to have had knowledge of Keane's plundering of the corporation and that they took no steps to oust him for the reason that they could obtain a better settlement of their own claims "by dealing with the so-called president who desired to conceal the true condition of the affairs of the said Company and his own misdeeds in connection with its operations." It is alleged that appellees "claimed to be" such large stockholders of Independence that "they were in virtual control thereof," yet took no action to curb Keane's mismanagement. On this phase it is to be noted that there is no allegation that appellees owned or claimed to own any stock in Independence other than the Class A common, their title to which was being currently denied and contested by Independence. The court is not informed of the means by which, in the circumstances, they could act effectively. Indeed, if the petition be taken at its face value they had in law no standing as stockholders or right to interfere in the corporate affairs. In any event we think they were not obliged to halt their suit until the internal affairs of the corporation were corrected.

The petition, in substance, alleges further that prior to the settlement of the suit Keane had sold 218,000 of the Clayton shares belonging to Independence and had appropriated the proceeds to his own account; that 613,000 Clayton shares had been distributed as dividends to the common stockholders of Independence[4]; and that there was thus left in the treasury a balance of 170,000 Clayton shares. It is alleged that as the result of a conference between Keane and one Sekulic the latter approached appellees with the proposition that Keane would, in settlement of their demands, turn over to them all the Clayton shares remaining in the treasury, to wit 170,000 shares, plus the sum of $10,050 in cash, they, however, to relinquish to Independence 400,000 shares of their Class A common, retaining the balance as their own; and that Sekulic informed appellees that if they would not accept the proposal they would receive no dividend in consequence of any judgment secured against Independence for the reason that Keane would sell and dispose of the remaining Clayton stock and apply the funds to his own use. It is averred that appellees accepted the proposal with knowledge that they would thereby secure all the remaining Clayton stock, including 73,175 shares "being held in trust" by Independence for the benefit of the common stockholders who had not yet received their dividend.

---

4 It appears in the petition that 2,744,700 shares only of the ordinary common stock of Independence had been issued. Thus, on the basis of one share of Clayton to four of Independence, it required 686,175 shares of Clayton to fill the dividend requirements as restricted to the ordinary common stock. Clayton shares to the number of 73,175 had not been called for by common stockholders. The balance of 613,000 shares had been distributed.

The foregoing paragraph is a summary of a series of allegations running through eight pages of the printed record. Independence argues that against this background the settlement reflects, not a reasoned compromise of a doubtful lawsuit, but merely the panicky surrender of all available assets by an officer under pressure or threat of exposure.

In urging this view counsel for Independence ask us to heed Dryden's couplet: "Errors, like straws, upon the surface flow; he who would search for pearls must dive below." We have done so and come up, among other things, with a small pearl or two possibly worth mentioning. Made a part of the petition is an audit of the affairs of Independence prepared by a certified public accountant, covering the year 1945 and the three prior years, and forming part of a report submitted by Keane as president of Independence to the Securities and Exchange Commission in March 1947. The audit fully discloses Keane's sales of Clayton shares referred to in the petition, and also shows that he was currently acquiring substantial amounts of Clayton stock on behalf of Independence. It would appear from the submission of this audit and report that within nine months after the entry of the judgment Keane himself made a public disclosure of the internal affairs of Independence and of his own irregularities as its president. One is accordingly obliged to take a dim view of the argument, here so heavily stressed, that Keane's anxiety to avoid exposure of those matters was the moving factor inducing the settlement.

On other considerations, too, this central thesis of the petitioner hardly survives analysis. It is obvious that Keane's misdeeds were irrelevant to the issues joined in the suit and would not be disclosed in the ordinary course of a trial of those issues. If Independence was really in position to establish fraud in the acquisition by Kingsbury and Marquardt of its Class A common it would have been greatly to Keane's advantage to proceed to trial rather than to multiply the difficulties of his situation by effecting the settlement he did. There is, it must be remembered, no allegation that appellees made any threats of exposing Keane, or that they put him under any duress other than the pressure of their suit.[5] Viewed dispassionately, the settlement bears the earmarks of a compromise between adversaries neither of whom felt entirely confident of his ability to prove his case.

With respect to appellees' knowledge that the settlement of their demands would absorb Clayton shares otherwise claimable by common stockholders it is notable that no facts appear which would place appellees in a trustee relationship toward such stockholders. It is the rule that a stockholder may sue the corporation to recover a dividend declared, since he holds his right to the dividend in his individual capacity. Fletcher, Cyc. Corp., Perm. Ed., Vol. 13, § 5922. After the dividend is declared all community of interest in relation to the same as among stockholders themselves and as between them and the corporation is at an end. And the action to recover may be maintained not only by the stockholders recognized by the corporation as entitled to share in the dividend, but by those wrongfully denied the right to share therein. Fletcher, Cyc. Corp., Perm. Ed., Vol. 11, § 5365.

The nature of the burden resting on a party who seeks to set aside a judgment for fraud in its procurement is well understood, and counsel are not in serious disagreement as to the applicable principle. The fraud must be extrinsic or extraneous to the issues in the action in which the judgment was rendered. It must have been

---

[5] There is an allegation that in July 1945—almost a year prior to the settlement—appellees became alarmed at the large sales of Clayton and notified the Clayton Company to stop all further transfers of Clayton shares belonging to Independence, saying that if this were not done they would bring injunction proceedings to prevent further transfers. There is no allegation that this admonition came to Keane's notice or, if so, that it had any effect on his activities, or even that the Clayton Company heeded the notice. We are unable to see the relevancy of the incident as indicating fraud, connivance, or duress on appellees' part.

practiced or connived at by the successful party, and it must be such as prevented the losing party from fully and fairly presenting his case or defense. Zounich v. Anderson, 35 Idaho 792, 208 P. 402; United States v. Throckmorton, supra; Toledo Scale Co. v. Computing Scale Co., supra; Donovan v. Miller, supra. Cf. Restatement of the Law of Judgments, § 122 (p. 593), Comment "e" (p. 596). Common "e" of the Restatement is illuminating and we quote it: "Collusion or duress. There is collusion where a party to an action or someone acting on his account induces a fiduciary to neglect or to act contrary to; the interests of the beneficiary. This may be accomplished by a money payment or promise of future benefits to the fiduciary, or by causing him to act out of friendship or by persuasion. Mere knowledge that the fiduciary is neglecting the interests of the beneficiary does not constitute collusion; there must be some cooperation or activity in causing him to act wrongfully."

 It must be remembered that a petition to vacate a judgment is addressed to the sound legal discretion of the trial court, and its determination will not be disturbed except for abuse of discretion. Western Union Telegraph Co. v. Dismang, 10 Cir., 106 F.2d 362, 364; Bush v. Bush, 61 App.D.C. 357, 63 F.2d 134; In re Rochester Sanitarium & Baths Co., 2 Cir., 222 F. 22, 26. Particularly is this true in this instance, where the experienced judge passing on the petition had presided in the litigation in which the judgment was entered, and it is claimed that fraud was practiced upon the court. Certainly we are not able to say that the court's ruling adverse to the petition was wrong.

Affirmed.

DENMAN, Chief Judge (dissenting).

It will be a shock to the legal profession that this court holds, in a proceeding in equity, that stockholders suing a corporation known by them to be entirely controlled by president Keane, also known by them to be a criminal, as yet undisclosed to the public, who has continually robbed the corporation of its Clayton stock[1] and who, as an inducement for their action, threatens them to steal all its remaining Clayton stock,[2] and who was necessarily in fear of exposure by them either by a stockholders' suit for restitution for the thefts or by seeking a criminal prosecution, may secure his stipulation for a judgment against his corporation by which they obtain all the 170,000 Clayton shares the criminal has not yet stolen, a part of which consists of 73,175 shares of Clayton stock which they knew were held in trust by the corporation for other stockholders,[3] without disclosing to the court to which the stipulation is presented and which entered judgment thereon that part of the benefit they received was illegally taken from other stockholders, or the criminal character of the stipulator and what he might fear from those benefited by his action if he could not effect a settlement with them.

It will also startle the profession that such may be held without mention of, much less consideration of, any of the pertinent cases offered on behalf of appellants, and disposing of their contention on the authority of a text writer, who nowhere states the law to be as stated in the opinion.

The petition's allegations of appellees' connivance with Keane to give them the Clayton shares held in trust for the other stockholders are clear cut. They are:

" * * * The defendant Company, the Independence Lead Mines Company, now asserts that the said judgment is fraudulent and is a fraud upon this Court and this defendant Company, and makes this motion to set aside the same so this defendant can assert its lawful rights and defend and protect the rights of the holders of the common, assessable stock of this defendant Company; that no disclosure was made to this Court that the award of 170,000 shares of Clayton to the plaintiffs would deprive common assessable stockholders of a dividend previously declared, in the amount of

---

[1] Maj. op., 175 F.2d 986. This, like other facts alleged in the dismissed motion to set aside the judgment, is to be taken as true solely for determining whether a cause of action has been alleged.

[2] Maj. op., 175 F.2d 986.

[3] Maj. op., 175 F.2d 986.

73,175 shares of Clayton which was a trust for said common stockholders held by the defendant Company and its so-called President, F. C. Keane." [Tr. 70.]

"Upon information and belief, the said defendant alleges the following: That the doings and transactions of the said F. C. Keane in regard to dissipating the cash and funds of the Independence Lead Mines Company and selling the stock of the Clayton Silver Mines Company belonging to the Independence and squandering and dissipating the funds realized therefrom for his own benefit, and the extent of the possession by the Independence Lead Mines Company of the sum of only 170,000 shares of Clayton, including over 73,000 shares held in trust for common assessable stockholders, were well known in all particulars to the said plaintiffs long prior to the settlement made in this controversy and the judgment entered therein. * * *" [Tr. 73.]

The law of the state of Independence's incorporation, Arizona, controls with respect to the rights of stockholders against corporate officers who connive with one group of stockholders to give them dividends out of the property to be distributed to other stockholders. National Lock Co. v. Hogland, 7 Cir., 101 F.2d 576, 582. Cf. Harr v. Pioneer Mechanical Corporation, 2 Cir., 65 F.2d 332, 334.

In the case of Johnson v. Moore, 31 Ariz. 137, 145, 250 P. 995, there was such connivance by which the corporate officers declared a dividend of the proceeds of the sale of certain company assets and then paid over all the proceeds to certain stockholders to the exclusion of other stockholders. The latter brought suit against both the corporation and the stockholders receiving all the dividend moneys. The Arizona supreme court held, 31 Ariz. at page 145, 250 P. at page 998,

"* * * If the officers of defendant corporation had merely retained in their custody as such officers plaintiff's share of the proceeds of the sale, his remedy would indeed be ex contractu, but the allegation of the complaint is that the corporation and the individual defendants, with the 'knowledge, consent, aid, and connivance one with the other,' divided among the defendants, not only their pro rata of the $42,000 but also that which should have been paid plaintiff. If the trustee of a sum of money pays it to a person not entitled to receive it, with full knowledge on the part of the latter as to the facts, and his active participation in the illegal payment, it is undoubtedly a breach of trust, for which both the trustee and the recipient of the money are liable as in conversion. White v. Sherman, 168 Ill. 589, 48 N.E. 128, 61 Am.St.Rep. 132; Duckett v. National Mechanics' Bank, 86 Md. 400, 38 A. 983, 39 L.R.A. 84, 63 Am. St.Rep. 513; American Trust & Banking Co. v. Boone, 102 Ga. 202, 29 S.E. 182, 40 L.R.A. 250, 66 Am.St.Rep. 167; 38 C.J. 2055. * * *"

Here the claiming owners of 1,000,000 shares take the 73,125 shares belonging to holders of 292,700 by collusion with Keane in control of the corporation. So far as concerns equity, the obligation to return shares thus collusively acquired is no different from where a majority persuades a corporate management to give them all of a dividend to the exclusion of the minority. It is the wrongful control of the corporate officers by which the latter violate a trust for all the stockholders which gives equity its jurisdiction. Hence the following cases of deprivation of a minority of its share of a distribution of corporate assets are applicable. Heimbauch v. Hitchcock, 115 Kan. 182, 222 P. 114; Morse v. Metropolitan S.S. Co., 87 N.J.Eq. 217, 100 A. 219.

The majority opinion does not mention, much less distinguish, these cases, offered on behalf of appellants. It cites no authority to the contrary from Arizona or elsewhere. I therefore dissent from its holding "that no facts appear which would place appellees in a trustee relationship toward such stockholders. It is the rule that a stockholder may sue the corporation to recover a dividend declared, since he holds his right to the dividend in his individual capacity. Fletcher, Cyc. Corp., Perm. Ed., Vol. 13, § 5922. After the dividend is declared all community of interest in relation to the same as among stockholders themselves and as between them and the corporation is at an end."

Nowhere does Fletcher state that *after* a dividend is declared one group of stockholders may wrongfully cause the directors to distribute to them the dividends belonging to other stockholders and yet create no trust relationship to those so wronged.

Here is clear Arizona authority that there is community of interest creating a trust relationship between the stockholders where appellees had "knowledge that the settlement of their demands would absorb Clayton shares otherwise claimable by common stockholders."

Independence is still the trustee for the stockholders who have not received their dividend of Clayton shares and owes the duty to recover such specific property (a) to such stockholders and (b) to the corporation and its creditors[4] to avoid a suit for the value of the shares if the stockholders, denied the distribution of this specific property, sue for its value.

In the discharge of these duties, the present honest officials find a judgment, procured by such connivance, in the road to the recovery of the Clayton shares for the stockholders entitled to them. It is clear that equity requires the removal of the obstruction of that judgment, as here sought.

It seems clear that it was the duty of the appellees to disclose to the court the character of the criminal controlling the corporation and of his proposed settlement depriving the other stockholders of the stock held in trust for them, so offered for their connivance, and have the court appoint for that litigation a trustee for the corporation, who would be free of any such pressure, to defend against the claim of the appellees for his trust res, the clayton stock.

It is, of course, unfortunate that litigants find themselves required to procure such a substitution, just as it would be unfortunate for them if the person in sole control of the corporation were imbecile or insane.

I dissent from the opinion's statement that to procure such a trustee would require an adjustment of the internal affairs of the corporation.[5] Even if it required such an adjustment, such a burden would not make the stipulation any the less one procured by the obvious coercive compulsion in the mind of the criminal Keane and one by which the appellees in connivance with him obtain the stock held in trust for other stockholders.

I dissent further from the opinion's statement, seeking to show Keane could have no fear of exposure by appellees, that the holders of the outstanding Class A common stock could not sue "effectively" to prevent Keane from further stealing the corporate assets[6] which gave value to the Class A common as well as all the other outstanding stock, or to remove Keane as president.

The only ground upon which the maintaining of such a suit could not be "effective" is that their outstanding stock should be cancelled, an issue they had to face in any suit against the corporation and which, if the fact, would defeat their defense to the instant action. Appellees had no such impression of their lack of power to sue effectively when they threatened such a suit to enjoin the Clayton Company to prevent further stealing of Independence's Clayton shares.[7]

It is now long established in Arizona, the state of Independence's incorporation, supra, in Idaho, and in the federal courts that stockholders' suits are maintainable in just such a situation of wrongful dealing with the corporate assets, Ryan v. Old Veteran Mining Co., 37 Idaho 625, at page 636, 218 P. 381, at page 384, a stockholders' suit in which the court said, "Directors of corporations act in a fiduciary capacity. They hold the corporate property in trust, and any attempt on their part to divert the use of such property to their personal profit or interest is a violation of the trust imposed by virtue of the office. Riley v.

---

[4] In this connection the transcript shows at pages 97 and 98 a deficit in earned surplus of $198,597.63 for the year 1943; of $222,948.04 for 1944, and a further net loss of $67,315 for the year 1945.

[5] Maj. op., 175 F.2d 986.

[6] Maj. op., 175 F.2d 986.

[7] Maj. op., 175 F.2d 987, footnote.

Callahan Mining Co., supra. [28 Idaho 525, 155 P. 665]." Geddes v. Anaconda Copper Mining Co., 254 U.S. 590, 599, 41 S.Ct. 209, 65 L.Ed. 425; Cutting v. Woodward, 9 Cir., 255 F. 633, 634. This court, by holding or dictum, thus should not overrule or cast doubt upon its own decisions.

I further dissent from the contention of the opinion that the fact that Keane was compelled to disclose his misappropriations nine months after the appellees had wrongfully acquired the 73,175 Clayton shares belonging to other stockholders by virtue of his threat to appellees to steal for himself all the remaining 170,000 shares, warrants the inference that any other stockholder than appellees knew of his thefts when the latter agreed to his stipulation.

There is nothing in the petition inconsistent with its allegation that appellees sought to obtain a better settlement of their claims "by dealing with the so-called president who desired to conceal the true condition of the affairs of the said Company and his own misdeeds in connection with its operations." That nine months after they made such a settlement he was unable further to conceal his wrongdoing is no evidence that Keane's apprehension of appellees' knowledge of his crimes was not a factor in the negotiation nine months earlier which wrongfully gave to appellees the 73,175 shares belonging to other stockholders.

I further dissent from the opinion's statement that Keane "was *currently* acquiring substantial amounts [plural] of Clayton stock on behalf of Independence." The only statement in this regard is that of the auditor's report (tr. 99) that Keane misappropriated 229,000 shares and that "F. C. Keane reacquired 11,000 shares which were issued as dividends to common stock of the Independent Lead Mines."

This shows a net misappropriation of the 218,000 shares admittedly stolen. Dryden's pearl of a restoration of but 5% of his stealing thus appears to be ersatz. Instead of the purchase being "on behalf of Independence" as stated in the opinion, it is obviously on *behalf of Keane* to restore it to Independence from which, as a part of the dividend already declared, it was dis-

tributed before the stipulation was signed and the judgment on it rendered.

That the amount known by appellees to have been stolen when they entered into the stipulation giving them the 73,175 shares which belonged to the other stockholders is 218,000 shares appears from the following table.

1) Total Clayton stock held by Independence (Tr. 7).... 1,001,000
2) Amount of Clayton to be distributed .............. 686,175
 (1 Clayton share for each 4 shares of 2,744,700 outstanding common.) (Tr. 67, 68)
3) Undistributed Clayton shares remaining ............ 314,825
 (1 minus 2) (Tr. 68)
4) Total amount of Clayton sold by Keane and proceeds kept by him (Tr. 99) 229,000
5) Net amount misappropriated after restoring by Keane of 11,000 shares (Tr. 98, 99) .................... 218,000
6) Amount of Clayton left in Independence not declared in dividends (2) (3 minus 5) 96,825
7) Amount of Clayton shares still left in trust of 686,175 dividend (3 above) (Tr. 68, 70) ................. 73,175
8) Total Clayton remaining in Independence (6 plus 7).. 170,000
9) Amount of Clayton stipulated to be given Kingsbury and Marquardt in settlement (Tr. 69)........... 170,000
10) Amount of Clayton left in Independence after settlement (8 minus 9) ....... 0

I dissent also from the opinion's seeking to deprecate the petition by stressing that its allegations concerning the appellees' knowledge of Keane's criminality and their connivance with him to obtain the shares of other stockholders is on information and belief. It is apparent, if the honest successor directors of Independence were not present when the appellees' knowledge was

obtained, the wrongful connivance never could have equitable relief, unless they could allege it on information and belief.

The district court erred in holding the petition failed to state a cause of action and its judgment of dismissal should be reversed.

## On Petition for Rehearing

PER CURIAM.

The petition for rehearing is denied.

DENMAN, Chief Judge (dissenting).

This appeal is clearly one requiring a rehearing in banc, for the reasons stated in my dissent filed on February 28, 1949, and the further reasons here stated.

(A) *The attempt of two judges in a panel of three judges to deny a petition for rehearing in banc violates the law as established in United States ex rel. Robinson v. Johnston, 316 U.S. 649, 650, 62 S.Ct. 1301, 86 L.Ed. 1732, and Textile Mills Securities Corp. v. Commissioner, 314 U.S. 326, 333 et seq., 62 S.Ct. 272, 86 L.Ed. 249.*

The order of August 22, 1949, of this panel of this court does not truly describe its action. What it attempts to do is to deny a petition to the court in banc for a rehearing by our whole court of seven judges. The amendment of August 22, 1949, attempts to conceal the fact disclosed in the order as first entered on August 8, 1949. The August 8th order is entitled "Order denying petition for rehearing in banc" and the order of that date reads, "The petition for rehearing en banc is denied."

In this, the first order followed the wording of the petition to the court in banc reading "Petition for rehearing en banc" which prayed "Appellant respectfully prays that this cause be reheard and considered in banc and prays for a reconsideration of the opinion filed herein of February 28, 1949, by reason of the dissenting opinion likewise filed herein and because of the following points * * *."

In view of the Supreme Court decisions cited above, it is too obvious to need argument that two judges cannot thus assume to act on a petition addressed to seven judges.

. (B) *Further grounds of dissent.*

The court's opinion establishes for this circuit as proper conduct for an attorney, an officer of the federal courts, here of two widowed women clients, an unethical wrong which stands out like the sore thumb of colloquial speech. By such unethical wrong was prevented a decision of the merits affecting stockholders not joined as parties, for whom Independence was trustee.

The issue presented by the complaint, upon which the challenged judgment rests, is whether the appellees' stock in Independence entitled them to participate with other Independence stockholders, not joined in the action, in the distribution of the Clayton shares declared as a dividend solely to other stockholders. Some of these other stockholders had received their dividend, others had not. None was joined in the action.

The motion charges that appellee widows and hence appellees' attorney knew that Independence's president Keane, the sole manager of the defendant, had embezzled so many of the Clayton shares that there were not enough left to make a full distribution to the stock of appellees and the other absent stockholders, if the court decided appellees' stock entitled to participate in the dividend.

With such knowledge it at once became the duty of the attorney for appellees, plaintiffs in the case, to advise the court that Independence, with Keane its sole manager, could not act as trustee for the absent other stockholders in the litigation which, if successful, so affected their right to the insufficient remaining unembezzled shares. The attorney should have asked the court either to substitute some unprejudiced person in Keane's place or for a joinder of the absent stockholders so known by appellees to have been wronged by Keane.

That Keane realized this is apparent from the desperate means he took to avoid such a disclosure of his crimes. He had one Sekulic advise appellees that if they did not enter into a stipulation by which they received *all* the unembezzled shares of

Clayton, *he would proceed to embezzle all the remaining shares.*

In this situation it became the duty of appellees' attorney to advise the court at once and procure an injunction against Keane, to protect not only Independence from such threatened last embezzlement of its Clayton shares but also to protect the other stockholders and his own clients.

Instead, the bait of acquiring all the remaining Clayton shares to the exclusion of the other shareholders was too alluring, and Keane's stipulation was signed by appellees' attorney and presented to the court. By this conduct he secured for his clients the judgment so depriving the absent stockholders of their day in court as to the conflicting claims of the appellees, and depriving them of the Clayton shares to some part of which they were entitled even if appellees established their claim to participate in the Clayton dividend.

It has been suggested that the stipulation by which the appellees acquired the Clayton stock belonging to the unjoined Independence shareholders may be valid because supported by a consideration to Independence consisting of the surrender by appellees of a part of appellees' Independence shares.

This suggestion is clearly untenable. The motion to set aside the judgment alleges that the issue of the shares held by appellees was fraudulently procured by appellees' husbands, from whom they acquired their present interest by inheritance. See paragraphs III, IV and V of motion, transcript pages 54, 58. The surrender of such fraudulently procured shares is no consideration to the company from which they were taken.

Attention is again called to the fact that the cases cited on behalf of appellant, showing the Idaho law controlling in this suit, declaring the trust relationship of a corporation to its shareholders with regard to dividends declared and not distributed, *are not only not considered and distinquished, if possible, but also not even mentioned.*

Such ignoring of cogent and pertinent contentions seems also to raise a question with respect to the obligation of an appellate court to its litigants.